In the Matter of the GUARDIANSHIP OF Michael Timothy O'BRIEN, Ward.

No. A13–1348.

Court of Appeals of Minnesota.

May 27, 2014.

Steve Beseres, Michael Herring, New Hope, MN, for appellant.

Ruth Y. Ostrom, Charles W. Singer, Minneapolis, MN, for respondents.

Considered and decided by CONNOLLY, Presiding Judge; PETERSON, Judge; and SMITH, Judge.

## OPINION

SMITH, Judge.

We reverse the district court's declaratory judgment that appellant lacks the mental capacity to marry because the district court did not apply the correct standard and did not support its determination with sufficient relevant findings, and we remand for the district court to reconsider its decision in accordance with this opinion.

## FACTS

Appellant Michael O'Brien is the 27–year–old ward (and son) of respondents Timothy and Judith O'Brien. The district court appointed respondents as guardians for Michael in 2004, citing his "serious persistent mental disorder," including di-

agnoses of "Bipolar disorder and severe Attention Deficit Hyperactivity Disorder." A later assessment questioned the bipolar-disorder diagnosis and suggested a diagnosis of fetal alcohol syndrome. The guardianship order gave his guardians authority over Michael's "care, comfort and maintenance," his "clothing, furniture, vehicles or other personal effects," and his "necessary medical or other professional care." It also authorized them to "[a]pprove or withhold of any contract except for necessities" and to "[a]pply on behalf of [Michael] for any assistance, services, or benefits available to [him] through any unit of government." The guardianship was modified in 2009 to give Michael's guardians control over his place of residence.

Michael lives in a group home. His responsibilities include keeping his room clean, cooking, washing dishes, and doing laundry. The group-home staff dispenses Michael's medications to him. He is free to come and go as he pleases from the group home. He testified that he has a good relationship with his guardians and that he loves them, but he disagrees with some of the limitations they place on him.

Michael began dating E.J. in late 2010. She is in her early 20s, has a young child, and is a client in a special-needs program. Michael and E.J. see each other about twice a week, and Michael sleeps over at E.J.'s residence about one night a month. E.J. described their relationship as "very loving," and she reported that "[w]e have our disagreements but we work through them by talking them out." She testified that Michael has never been physically abusive or verbally aggressive toward her. Michael also described their relationship as "very good" and affirmed that he is in love with E.J. He testified that when they have a disagreement, "I really just stand down from it so it doesn't escalate."

In October 2012, Michael moved the district court for a declaratory judgment that he has the right to marry E.J.[1] The parties agree that a ward under guardianship has the right to marry, if the ward has the requisite capacity. But the parties dispute whether Michael has this capacity. A district court referee convened a hearing, receiving testimony from Michael, E.J., and both guardians. Judith testified about Michael's behavioral problems leading up to his placement under guardianship, including his use of a BB gun to shoot out windows at a cabin and his causing damage to different vehicles. She related recent incidents, including his pressuring her to violate traffic laws on the way to the hearing, his attempt to grab the wheel of a group-home van, and his causing damage to the van's mirror. Judith also identified concerns about his medications.

Over hearsay and improper-expert-opinion objections from Michael's counsel, Judith also testified to the authenticity and substance of three documents assessing Michael's mental and emotional condition. One document was an undated letter from an examining psychiatrist that summarized Michael's mental-health diagnoses, including "Fetal Alcohol Syndrome (FAS), ADHD, Bipolar Disorder, Mild Mental Retardation, and Cognitive Disorder NOS." It reported that he has an IQ of 71, but that he "functions day-to-day at a level that is below his IQ . . . because of his other cognitive deficits, difficulties with judgment, poor learning from experience, etc."

Another document was the same psychiatrist's 2011 evaluation of Michael. It doc-

---

1. Michael also petitioned at least twice for restoration of capacity, but withdrew both petitions.

umented Michael's history of behavioral problems and educational challenges, and it assessed his cognitive capabilities, stating that "[p]erception and judgment during testing session [were] adequate, as were thought processes and content. However, he displayed somewhat idealistic thinking in terms of planning for a future in which he would live independently and generally free of mental health problems." The psychiatrist rated Michael's general cognitive ability as "in the below average to impaired range" with "multiple forms of impairment." "Michael's overall broad independence was found to have an approximate age equivalent of a person who is 9 years and 9 months old." The psychiatrist concluded that "Michael initially presents as being more capable in terms of social functioning than is actually apparent upon more extended contact with him," and he predicted that Michael would continue "to have social interaction deficits and more difficulty learning new rules and adapting to new situations than most individuals." He opined that

> Michael possesses very low adaptive capacity and seems to be largely unable to function independently. He also has an increased likelihood of engaging in dangerous behavior . . . and has also placed himself in compromising situations during which he becomes sexually aggressive towards women. He seems to generally lack insight into the extent of his limitations and his psychological problems and does not believe that he needs consistent monitoring and supervision.

The psychiatrist recommended that Michael continue to reside in a group-home setting where he could benefit from a staff support system, but also that "it would be helpful to make him aware of his

strengths, such as capacities for friendliness and likeability, affective sharing, and interpersonal connections."

The final document was a 2012 letter from Michael's therapist, questioning whether Michael had been accurately diagnosed with bipolar disorder in 2011. It suggested that many of Michael's symptoms corresponded to those found in fetal alcohol syndrome. It opined that Michael "has very little understanding of his strengths and limitations and overestimates his capability" and that "[h]e has a history of getting involved in relationships and being exploited." Neither the psychiatrist nor the therapist testified at the hearing.

Timothy also testified. He opined, "I don't think Michael comprehends what marriage is" and that "[Michael] lacks the maturity to make a conscious decision to that effect and mental capacity as well." He stated his belief that Michael lacks understanding of "the responsibilities that are attendant to being married" and said that he was not "sure that [Michael] is presently capable of fulfilling them." He echoed Judith's concern that Michael's current medication might interfere with his capacity to get married. He also expressed concern that Michael had attended a movie with a woman other than E.J. several weeks prior to the hearing.

After receiving testimony and documents, the referee recommended denying Michael's motion. He described testimony given by Michael, E.J., and the guardians, but he did not make credibility findings. In part, the referee characterized Judith's testimony as stating that Michael "functions around the age of a seven year old."[2] Although the referee referenced

---

2. The hearing transcript reveals that Judith's estimate of Michael's functional age equivalence was based solely on her recollection of

what the psychiatrist verbally told her after he examined Michael. The psychiatrist did not testify at the hearing, and therefore was not

none of the information from the reports, he concluded that "[c]lear and convincing evidence exists that [Michael] remains an incapacitated person who lacks sufficient understanding or capacity to make or communicate responsible decisions regarding his person, including the ability to enter into a marriage contract."

The district court adopted the referee's recommendation. In doing so, it referred to portions of the referee's recommendation as "specific findings of fact" and it found that "the Referee made his findings after evaluating the credibility of each witness and weighing the evidence." Based on these characterizations, it found that "no evidence was presented that was counter to the evidence on which the Referee relied for his findings."

## ISSUES

I. Did the district court abuse its discretion by denying appellant's motion for declaratory judgment, based on its determination that appellant lacks the mental capacity to marry?

II. Did the district court abuse its discretion by admitting reports about appellant's medical conditions?

## ANALYSIS

### I.

██ Michael argues that the district court incorrectly interpreted Minnesota's guardianship and marriage statutes and denied him due process by denying his motion for declaratory judgment. We review a district court's determination of the terms of a guardianship for an abuse of discretion. *See In re Guardianship of DeYoung,* 801 N.W.2d 211, 216 (Minn.App. 2011) (reviewing the district court's removal of a guardian for an abuse of discretion);

*In re Guardianship of Wells,* 733 N.W.2d 506, 510 (Minn.App.2007) (reviewing the district court's appointment of a guardian for an abuse of discretion), *review denied* (Minn. Sept. 18, 2007); *cf. In re Conservatorship of Brady,* 607 N.W.2d 781, 784 (Minn.2000) ("Because the district court's determination of what is in the conservatee's best interests is an ultimate issue deduced from other facts in the record, we review that determination for an abuse of discretion."). We defer to the district court's factual determinations and credibility assessments. *Wells,* 733 N.W.2d at 510. But because a district court abuses its discretion when it misapplies the law, *see DeYoung,* 801 N.W.2d at 216, we apply a de novo standard of review to its interpretation of statutes, *Wells,* 733 N.W.2d at 509; *see also In re Guardianship of Mikulanec,* 356 N.W.2d 683, 686–89 (Minn.1984) (reviewing de novo review to a question of whether a guardian could be appointed to approve or disapprove a ward's marriage).

██ Marriage is a fundamental civil right. *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010 (1967). It is, however, subject to reasonable regulation by the state, provided that such regulations "do not significantly interfere with decisions to enter into the marital relationship." *Zablocki v. Redhail,* 434 U.S. 374, 386, 98 S.Ct. 673, 681, 54 L.Ed.2d 618 (1978). Minnesota law explicitly protects the right of wards to marry, unless barred by specific provisions of their guardianship. *See* Minn.Stat. § 524.5–120(11) (2012). Minnesota law also restricts the power of guardians to include "only those powers *necessitated* by the ward's limitations and demonstrated needs," and it directs the district court to issue "orders that will encourage the development of the ward's maximum self-reliance and independence." Minn.Stat.

examined as to his basis for any such state-

ment.

§ 524.5–310(c) (2012) (emphasis added). The ward retains all powers not specifically revoked by the terms of his guardianship, and the district court must specifically justify each of a guardian's powers with "a written finding by the court of a *demonstrated need* for that power." *Id.* (emphasis added).

▮▮▮ Although Minnesota law protects a ward's constitutional right to marry, it predicates the exercise of that right on the mental competence of the ward. *See* Minn.Stat. § 517.01 (Supp.2013) ("A civil marriage ... is a civil contract between two persons, to which the consent of the parties, capable in law of contracting, is essential."); Minn.Stat. § 517.02 (2012) (mandating that those "capable in law of contracting" to a marriage includes "[e]very person who has attained the full age of 18 years ... if otherwise competent"); *see also Johnson v. Johnson,* 214 Minn. 462, 466, 8 N.W.2d 620, 622 (1943) ("One who has been adjudged an incompetent may contract a valid marriage if he has in fact sufficient mental capacity for that purpose."). Minnesota law lacks, however, an articulated standard for what constitutes mental competence to contract marriage. Crafting such a standard begins with the standard for contracting generally. "Mere mental weakness does not incapacitate a person from contracting. It is sufficient if he has enough mental capacity to understand, to a reasonable extent, the nature and effect of what he is doing." *Timm v. Schneider,* 203 Minn. 1, 4, 279 N.W. 754, 755 (1938) (quotation omitted); *see also Lindsey v. Lindsey,* 369 N.W.2d 26, 30 (Minn.App.1985) ("Mental capacity [to enter into a contract] exists when a person can fairly understand the matter he is considering."), *aff'd as modified,* 388 N.W.2d 713 (Minn.1986). So although a ward may be found incompetent to make commercial contracts, that finding does not

automatically render him incompetent to make a marriage contract, because the nature of marriage contracts differs from that of other contracts. *See Johnson,* 214 Minn. at 466, 8 N.W.2d at 622. Any limitation on a ward's right to marry must therefore be supported by findings focused specifically on whether "a person clearly is incapacitated *with respect to choosing a spouse,*" *Mikulanec,* 356 N.W.2d at 688 (emphasis added); *cf. Parrish v. Peoples,* 214 Minn. 589, 596–97, 9 N.W.2d 225, 229 (1943) ("[I]f grantor or testator knows and understands the nature and effect of his act, he has sufficient capacity to enable him to dispose of his property") (quotation omitted). Thus, in accordance with the consensus of persuasive authority from other jurisdictions, we hold that the standard for a ward's competency to marry is that he understands the meaning, rights, and obligations of marriage. *See, e.g., Martin v. Martin,* 157 Fla. 835, 26 So.2d 901, 901 (1946) (Chapman, C.J., concurring) ("The mental capacity requisite to a valid marriage is a capacity to understand the nature of the contract and the duties and responsibilities it creates."); *Elfont v. Elfont,* 161 Md. 458, 157 A. 741, 746 (1932) ("Every variation from a normal mental condition is not in itself enough to avoid the marriage contract. The mental defect or derangement must be one having a direct bearing upon such contract. If the party entering the marriage relation has sufficient capacity to understand the nature of the contract and the duties and responsibilities which it creates, the marriage will be valid."); *Johnson v. Johnson,* 104 N.W.2d 8, 14 (N.D.1960) ("It seems that the best accepted test as to whether there is a mental capacity sufficient to contract a valid marriage, is whether there is a capacity to understand the nature of the contract and the duties and responsibilities which it creates." (quotation omitted)).

■ We also hold that the burden of proof is on those opposing a ward's competence to marry. In 1980, the legislature reformed Minnesota's guardianship statutes "to make it harder to create a guardianship and, once one is created, [ensure] that the powers of the guardian should be kept to the bare minimum necessary to care for the ward's needs." *Mikulanec,* 356 N.W.2d at 686–87. A district court may therefore allow a guardian to limit a ward's rights only as justified by "a written finding by the court of a demonstrated need for that power." Minn.Stat. § 524.5–310(c). With such a finding, the guardian may "exercise supervisory authority over the ward in a manner which limits civil rights and restricts personal freedom only to the extent necessary to provide needed care and services." Minn.Stat. § 524.5–313(c)(6) (2012). This places the burden of proof upon those who would limit a ward's right to marry. *See, e.g., Mikulanec,* 356 N.W.2d at 687.[3]

■ The district court here failed to make findings showing a demonstrated need to restrict Michael's right to marry. Instead of findings and credibility assessments, the referee's recommendation merely recounted the testimony of the participants in the hearing. Although the district court characterized these as "findings" in its order adopting the referee's recommendation, reports of testimony that are not "affirmatively stated as findings" are not proper findings. *See Dean v. Pelton,* 437 N.W.2d 762, 764 (Minn.App.1989).

Even if we interpret the district court's recounting of testimony opposing Michael's right to marry as its implicit findings, these findings do not focus on the critical question. The district court focused primarily on testimony describing Michael's behavioral problems, not his mental capac-

ity to comprehend the meaning, rights, or obligations of marriage. The only testimony it described relating to Michael's mental capacity was a reference to Judith's recollection that Michael's psychiatrist had told her that Michael functioned at the level of a seven-year-old and the personal opinion expressed by both guardians that Michael lacks the capacity to marry based on the short-term duration of his prior relationships and arguments they overheard between Michael and E.J. While the testimony of the guardians is relevant, such testimony alone is not sufficient to establish a lack of competence to marry. Accordingly, we reverse the district court's denial of declaratory judgment and remand for the district court to reconsider based on appropriate findings.

■ The district court on remand should reopen the record to receive additional evidence and testimony. *Cf. Parrish,* 214 Minn. at 597, 9 N.W.2d at 229 ("[T]here is such doubt in our minds as to the competency of [the ward] that we feel a new trial should be granted on this issue in the interests of justice."). Because those opposing the ward's competence to marry bear the burden of proof, evidence opposing the ward's competence to marry must move beyond generalized intelligence assessments, age equivalencies, or the subjective views of the guardians. *Cf. In re Welfare of Children of B.M. & C.G.,* 845 N.W.2d 558 (Minn.App.2014) (concluding that district court's finding that a parent had an IQ of 73 was not sufficient to establish his unfitness to parent). It should include expert testimony specifically focused on assessment of the ward's mental competence to understand the meaning, rights, and obligations of marriage. *Cf. In re Guardianship of Kowalski,* 478 N.W.2d 790, 793 (Minn.App.1991) (holding that a district court's crediting of

---

**3.** At oral argument, respondents agreed that they have the burden of proof.

lay witness testimony regarding a ward's decision-making capacity over contradictory and unanimous expert testimony was clearly erroneous), *review denied* (Minn. Feb. 10, 1992).

Because a ward retains a constitutional right to marry, the district court should begin its evaluation with the presumption that the ward is competent to marry. In addition to its consideration of evidence offered by those opposing the ward's competence, it should consider testimony from the ward regarding his marriage preferences, *cf. In re Guardianship of Kowalski,* 382 N.W.2d 861, 865 (Minn. App.1986) (noting that "[p]reference of the ward is an important factor" when choosing from between multiple possible guardians), *review denied* (Minn. Apr. 18, 1986), and his understanding of the meaning, rights, and obligations of marriage, *cf. Parrish,* 214 Minn. at 595–96, 9 N.W.2d at 229 ("The question of whether a person is incompetent by reason of mental disability ... is not subject to demonstrable proof, but his mental disability is in the final analysis a matter of opinion, which must be based upon his conduct, actions, and statements in connection with surrounding circumstances and conditions."). Its findings must then draw on this evidence with specificity to support a determination of the ward's competence to marry that can be reviewed as a factual determination for clear error. *See Johnson,* 214 Minn. at 467, 8 N.W.2d at 622 ("In a particular case the question of mental competency to contract marriage is a fact question.").

## II.

Michael also challenges the referee's admission of reports from his psychiatrist and psychologist. The reports were introduced into evidence with portions read as part of Judith's testimony. Objections to evidentiary rulings are outside the scope of an appeal unless specifically preserved in a motion for a new trial. *Sauter v. Wasemiller,* 389 N.W.2d 200, 201 (Minn.1986). "District court review of a referee's order is not a prerequisite to our review of that order, but district court review is in the nature of a motion for amended findings or a new trial and would affect the scope of review on appeal." *Kahn v. Tronnier,* 547 N.W.2d 425, 428 (Minn.App.1996) (quotation omitted), *review denied* (Minn. July 10, 1996). Because Michael did not challenge the referee's admission of the reports in his request for district court review, it is not within the scope of his appeal here. Accordingly, we do not address the referee's admission of the reports.

## DECISION

Under Minn.Stat. § 517.02, a ward must have sufficient mental capacity to marry. When determining whether a ward is competent to marry, the burden of proof lies with those challenging the ward's competence, and their evidence should be supported by expert testimony. The district court must make specific findings that address the ward's ability to understand the meaning, rights, and obligations of marriage. Because the district court did not make sufficient findings to establish that Michael lacks the capacity to understand the meaning, rights, and obligations of marriage, we reverse the district court's declaratory judgment that Michael lacks the competence to marry, and we remand for further proceedings consistent with this opinion.

**Reversed and remanded.**