*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0220**

State of Minnesota,
Respondent,

vs.

Corey Gordon,
Appellant.

**Filed January 19, 2016
Affirmed
Hooten, Judge**

Hennepin County District Court
File No. 27-CR-13-18645

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Chutich, Presiding Judge; Ross, Judge; and Hooten, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HOOTEN**, Judge

Appellant challenges his conviction of third-degree criminal sexual conduct, arguing that (1) the state failed to prove beyond a reasonable doubt that the complainant

was mentally impaired and thus unable to consent as a matter of law; (2) his prosecution infringed upon A.S.'s right to procreate; and (3) the district court committed reversible error by refusing to give clarifying instructions to the jury. Appellant raises additional issues in his pro se supplemental brief. We affirm.

**FACTS**

For the first 23 years of her life, A.S. had normal intellectual capacity and cognitive function. She worked as a hair stylist for a few years after earning a degree in cosmetology and later worked at Wells Fargo in the finance department. She was planning on going back to school to get a degree in finance, but her behavior changed abruptly in early 2005. After exhibiting symptoms of confusion, memory problems, migraine headaches, blurry vision, and dizziness, she was diagnosed with Susac's disease.

Susac's is a very rare neurological disorder that affects the brain, the eyes, and the ears. Because the immune system of a Susac's patient attacks the blood vessels within the brain, eyes, and ears, the disease can cause small strokes in parts of the brain. Susac's patients may suffer multiple attacks, which may cause permanent deficits. Due to damage to the brain, Susac's can affect thinking, cognition, memory, and judgment. Susac's can also cause depression, anxiety, and hallucinations.

A.S. suffered her first Susac's attack in 2005, which caused her to have memory and thinking problems, depression, some speech impairment, and mild motor problems. After receiving treatment, her condition improved, but she did not return to her level of functioning prior to the attack. Neuropsychological tests conducted after her first attack in 2005, which measured her memory and thinking, indicated that she was functioning at the

level of a fifth grader. She suffered a second attack in June 2007, which further affected her memory and thinking. Again, she improved and her condition stabilized, but she did not return to her level of functioning prior to the 2007 attack. A.S. suffered a third attack in 2010, which caused further deficits, including "a lot of motor deficits, walking balance deficits." According to her neurologist, she continued to exhibit significant problems with her thinking and judgment. Again, although there was some improvement, she did not return to her level of functioning prior to the 2010 attack.

A.S. continues to suffer physical and cognitive deficits as a result of her Susac's attacks. She uses a walker and wears leg braces on both legs. Due to damage to her eyes and ears, she wears hearing aids and glasses. The disease has also damaged her frontal lobe, which is the area of the brain that controls reasoning, planning, organization, understanding consequences, and emotional control. According to A.S.'s neurologist, her judgment, ability to reason, critical-thinking skills, and insight are impaired because of her disease. A.S. is easily manipulated, lacks the capacity to live independently or make medical or financial decisions for herself, and lacks emotional control. She struggles with calculations, has trouble remembering words, and is unable to hold a competitive job or participate in formal schooling.

A.S. lives with her mother, M.R., who is her court-appointed guardian. Under the guardianship, M.R. is responsible for A.S.'s medical care, financial management, and residence.

In October 2012, appellant Corey Gordon approached A.S. at the Mall of America and told her that she looked like a model. Gordon helped her find a coffee shop where she

3

had arranged to meet her mother and waited with her there. While at the coffee shop, Gordon asked A.S. about her condition, and after she told him that she had Susac's, he looked up the disease on his computer. A.S. told Gordon that her disease made her confused and that she went to speech therapy and physical therapy at the Courage Center. A.S. gave Gordon her phone number, and the next day he called and asked to see her.

Soon after they first met, Gordon began having sex with A.S. Gordon had sex with her in the assisted bathrooms at the Mall of America and at her house. Posing as her personal care attendant, Gordon accompanied A.S. when she went to her physical therapy appointments at the Courage Center three times a week. While there, he had sex with A.S. before her appointment. Gordon also made videos of himself sexually penetrating A.S. vaginally, anally, and orally. According to A.S., Gordon told her to not tell anyone that he was having sex with her, explaining that since she was a vulnerable adult, he could be arrested for rape.

Shortly after he met A.S., Gordon called M.R. on her cell phone and let her know that he had been talking to A.S. When M.R. asked Gordon why he had been talking with A.S., he explained that "he has a soft spot in his heart for people with disabilities." M.R. told Gordon about A.S.'s condition and told him that it was not "a good idea for him to be talking with [A.S.]." Sometime after her initial telephone conversation with Gordon, M.R. became concerned that A.S. was still having contact with Gordon because she saw "weird" texts "that made [her] feel very uncomfortable" on A.S.'s phone from a number she did not recognize. When M.R. called the number, Gordon answered. During that conversation, M.R. again informed Gordon of A.S.'s limitations and told him not to contact A.S. After

4

being alerted to their mother's concerns about Gordon, A.S.'s two sisters and the boyfriend of one of the sisters called Gordon and told him to stop contacting A.S., explaining her limitations, her condition, and the fact that she was under a legal guardianship.

On May 24, 2013, M.R. drove A.S. to the Courage Center and saw Gordon there. M.R. did not recognize Gordon at first and asked him, "Are you Corey?," to which he replied, "[N]o." Realizing that the individual was Gordon, M.R. became very upset and told the front desk staff to call security, but Gordon left while M.R. was speaking with the staff. After leaving the Courage Center, M.R. brought A.S. to a police station. A.S. told a police detective that Gordon had sex with her at the Mall of America, at her house, and at the Courage Center. A.S. told the detective that Gordon knew about her disease and that he had told her not to tell anyone or he would be arrested.

After an investigation, Gordon was arrested. Law enforcement seized several electronic devices during Gordon's arrest and several more when his residence was searched pursuant to a search warrant. The Minnesota Bureau of Criminal Apprehension preserved three video files from Gordon's digital camera that showed Gordon sexually penetrating A.S.

Gordon was charged in Hennepin County District Court with one count of third-degree criminal sexual conduct. Gordon was charged by indictment, which allowed the state to seek a life sentence under Minn. Stat. § 609.3455 (2012), which mandates life sentences for certain dangerous sex offenders.

After a jury trial, Gordon was found guilty of third-degree criminal sexual conduct. In a separate proceeding, the jury found that an aggravating factor existed, namely that

5

Gordon's sexual penetration of A.S. involved multiple forms of penetration. At the sentencing hearing, the state provided evidence of Gordon's criminal history, and the district court imposed a life sentence. This appeal followed.

**D E C I S I O N**

**I.**

Gordon argues that sufficient evidence does not support his conviction because the state failed to prove beyond a reasonable doubt that A.S. was mentally impaired and therefore unable to consent as a matter of law.

Gordon was convicted under Minn. Stat. § 609.344, subd. 1(d) (2012), which provides that a person who engages in sexual penetration with another person is guilty of third-degree criminal sexual conduct if "the actor knows or has reason to know that the complainant is mentally impaired." Being mentally impaired means that "a person, as a result of inadequately developed or impaired intelligence or a substantial psychiatric disorder of thought or mood, lacks the judgment to give a reasoned consent to sexual contact or to sexual penetration." Minn. Stat. § 609.341, subd. 6 (2012).

Gordon argues that the circumstantial evidence test applies here because mental impairment is proved by circumstantial evidence. Mental impairment may be proven, however, by direct evidence through expert testimony. *See State v. Hitch*, 356 N.W.2d 820, 822 (Minn. App. 1984) (utilizing expert testimony of psychologists in evaluating whether the complainant was "mentally defective"). Here, the state presented direct evidence of A.S.'s impairment through the testimony of A.S.'s neurologist and her psychologist. Because direct evidence of A.S.'s mental impairment was provided by the

6

state through expert testimony, the general principles regarding sufficiency of the evidence challenges apply.

When there is a challenge to the sufficiency of the evidence, an appellate court "make[s] a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in the light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Pendleton*, 706 N.W.2d 500, 511 (Minn. 2005). We view the evidence in the light most favorable to the conviction, assuming that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Brocks*, 587 N.W.2d 37, 42 (Minn. 1998). Viewed in the light most favorable to the conviction, the following facts regarding A.S.'s impairment were established at trial.

A.S. has Susac's disease, which can cause brain damage that may affect motor skills, cognition, memory, judgment, and thinking. As a result of her disease, A.S. suffered damage to her frontal lobe. Neuropsychological tests administered to A.S. in 2005, which test memory and thinking, showed that A.S. was "very impaired" and that she functioned at a fifth grade level. A.S. had two more Susac's attacks after 2005. After each attack, she suffered further deficits and never returned to the level she was at before each attack. Even before the third attack, A.S. was not deemed able to live on her own, to make decisions, or to handle finances. A.S.'s judgment, thinking, ability to reason, and insight are impaired, and she is easily manipulated. While A.S. would like to go back to school, she does not understand that, given her cognitive deficits, such an attempt would be a failure. A.S. does not have the capability to make reasoned financial or medical decisions or to live on her

7

own.  In March 2013, during her sexual relationship with Gordon, A.S. continued to exhibit "severe cognitive difficulties" and was unable to live independently.

Despite this evidence, Gordon points to a number of facts that, he argues, demonstrate that A.S. possesses the judgment to give reasoned consent to sex.  Gordon notes that A.S. is left at home alone at times, she can bathe and dress herself, and she takes her own medications.  Gordon also notes that A.S. wants to live alone, go to school, and does not want her mother to have guardianship of her.  But, both her neurologist and psychologist testified that A.S. is incapable of living on her own, of making reasoned financial or medical decisions or returning to school, and she lacks understanding of her deficits.

Gordon also notes that A.S. understands that pregnancy could trigger a Susac's attack and has repeatedly voiced her desire to undergo tubal ligation surgery as demonstrating her capacity to make reasoned judgments about sex.  M.R. testified, however, that A.S.'s desire to undergo the surgery stems from the fact that her mother and both of her sisters underwent tubal ligation surgery, explaining that A.S. just "want[ed] to do what we all are doing."  Moreover, A.S.'s neurologist testified that A.S. fixated on certain topics, like undergoing tubal ligation, and often was "more interested in wanting to pursue getting the tubal ligation, in the middle of other medical issues that were more pertinent to what is going on with her."  A.S.'s neurologist testified that such a fixation is called perseveration and is a symptom related to A.S.'s disease.  He also testified that he would not have pursued the possibility of A.S. getting tubal ligation surgery based solely on her desire to have the surgery.

Gordon points out that A.S. testified that her brother-in-law made a sexual advance toward her and that she told him to leave and argues that this incident demonstrates A.S.'s understanding that some sexual acts are inappropriate. But, A.S.'s psychologist testified that he suspected that the incident might be a delusion because A.S. had suffered from hallucinations in the past. The psychologist stated that even if the incident was not a hallucination, it would not change his opinion regarding A.S.'s impairment because "she has ongoing frontal lobe dysfunction" and remains vulnerable and easily manipulated.

Gordon argues that A.S. was a "willing and informed participant" in sexual acts with him because A.S. used "adult sexual language during sex and expressed her preferences to Gordon." Although A.S.'s use of sexual language and expression of sexual preferences indicate her sexual desire, they do not indicate that she had the *judgment* to give *reasoned consent* to sex.

Viewed in the light most favorable to the guilty verdict, the evidence at trial established that A.S. was mentally impaired and therefore unable to consent as a matter of law.

## II.

Gordon next argues that "the [s]tate has essentially restricted A.S.'s right to procreate in violation of the Bill of Rights for Wards" by prosecuting Gordon for sexually penetrating A.S. Under the Minnesota Bill of Rights for Wards, wards retain the right to "marry and procreate, unless court approval is required." Minn. Stat. § 524.5-120(11) (2012).

9

However, where a ward lacks the capacity to consent to sex, as was the case here, any right that the ward has to marry and procreate is contingent upon court approval. *In re Guardianship of O'Brien*, 847 N.W.2d 710 (Minn. App. 2014) (holding that any mentally disabled ward's right to marry is predicated upon the mental competence of the ward, which is a fact question for the district court); *see also* Minn. Stat. § 517.01 (2012) ("Marriage . . . is a civil contract . . . to which the consent of the parties, capable in law of contracting, is essential."); Minn. Stat. § 517.02 (2012) ("Every person who has attained the full age of 18 years is capable in law of contracting marriage, if otherwise competent."). As evidenced by the jury's verdict, A.S. lacked the capacity to consent to engage in a sexual relationship, much less marry or procreate. To the extent that Gordon attempts to use this "bill of rights for wards" to justify his own criminal sexual conduct, he subverts the purpose of the act and his argument is without merit.

**III.**

Gordon argues that the district court committed reversible error by refusing to give clarifying instructions in response to the jury's questions. "The [district] court has the discretion to decide whether to amplify previous instructions, reread previous instructions, or give no response at all." *State v. Murphy*, 380 N.W.2d 766, 772 (Minn. 1986). "[I]f a jury is confused, additional instructions clarifying those previously given may be appropriate since the interests of justice require that the jury have a full understanding of the case and the rules of law applicable to the facts under deliberation." *Id.* (quotation omitted). We review a district court's refusal to give a jury instruction for an abuse of discretion. *State v. Swanson*, 707 N.W.2d 645, 653 (Minn. 2006).

Appellate courts presume that juries follow the instructions given by the district court. *State v. Matthews*, 779 N.W.2d 543, 550 (Minn. 2010). Appellate courts "will assume that jurors are intelligent and practical people who take the district court at its word, and are guided by the plain language of the court's instructions." *In re Welfare of D.D.R.*, 713 N.W.2d 891, 903 (Minn. App. 2006).

Here, both the prosecutor and defense counsel stated that they noted no errors or omissions in the district court's instructions. The jurors were provided with copies of the instructions which they were allowed to take with them to the jury room. At the end of the first day of deliberations, the jury submitted the following question to the district court:

> (1). If a person says that he feels that [A.S.] was capable of giving consent to sexual penetration.
> (2). Would this have any impact on the second charge? (Element of the charge)
> (3). Does the State have to prove without a reasonable doubt that [A.S.] was not capable of making the decision for consent to sexual penetration?

At the beginning of the second day of deliberations, the district court, with the agreement of defense counsel, directed the jury to the instructions regarding the elements of the crime, including the second element, which requires that "the [d]efendant knew or had reason to know that [A.S.] was mentally impaired," and the definition of mental impairment.

Approximately two hours after resuming their deliberations, the jury sent a second note to the district court, which read as follows:

> We have one juror who is adamant that the level of [A.S.'s] mental impairment is central to our decision to convict [Gordon].

11

> The remainder of the jury is adamant that it was [Gordon's] decision to have sex and that he knew or had reason to know that [A.S.] was mentally impaired.
>
> The lone juror insists that the level of [A.S.'s] impairment is [germane].
>
> The majority believes that the dissenter is not following the law.
>
> Can we legally get around this issue?

Defense counsel moved for a mistrial on the grounds that the jury was "hung" and stated that if the district court did not grant a mistrial, it would request that the court "advise the [j]ury that the level of [A.S.]'s mental impairment is an element of – is the second element of the offense and the [s]tate is required to prove that beyond a reasonable doubt." The district court refused to declare a mistrial, reminded the jury that the state had to prove each of the elements of the offense beyond a reasonable doubt, and read a portion of the instructions concerning reaching a verdict. The district court also directed the jury's attention to the second element and the definition of mental impairment.

Approximately four hours later, the district court received two notes from the jury, the first of which read as follows:

> I have a concern that one juror lacks the ability to judge the facts of this case and apply those facts to the law as you have instructed us to do.
>
> He has used such phrases as:
> "I don't care what the law says"
> "Whether he knew (she was impaired) it or not does not determine the crime."
>
> He is unwilling to work towards reaching an agreement as he also said he is unwilling to see it another way.
>
> He is being governed by the sympathy he has for [A.S.] and not by the evidence presented.
>
> It is for these reasons that we are at an impasse and unable to come to a unanimous decision as you have requested.

The district court stated that it had received a second note that read as follows, with the first sentence in one person's handwriting, and the foreperson, in different handwriting, writing the second sentence and signing her name:

> No one said I do not care about the law.
> I was told I <u>HAD</u> to give this to you. I apologize for the inconvenience.

In response to the two notes, the district court reread the instruction regarding following and applying the law, reread the instruction about performing their duties as jurors without bias or prejudice, and reminded the jury to deliberate with a view toward reaching an agreement. The jury returned a verdict of guilty at 3:55 p.m. the following day.

Gordon argues that the district court abused its discretion by refusing to give a clarifying instruction because the jury's questions demonstrate that it was confused about the "central disputed element in this case" and its confusion was not alleviated by rereading the original instructions.

In response to the jury's notes, the district court directed the jury's attention to and reread portions of the jury instructions. "[A] trial court may properly refer to its initial charge when that charge provides the jury with the guidance necessary to resolve its confusion." *State v. Crims*, 540 N.W.2d 860, 864–65 (Minn. App. 1995), *review denied* (Minn. Jan. 23, 1996). Neither party argues that the jury instructions misstated the law. By rereading the jury instructions and directing the jury's attention to the second element of the offense and the definition of mental impairment, the district court provided the jury with sufficient guidance to resolve its confusion.

Gordon cites to *State v. Shannon*, 514 N.W.2d 790, 792–93 (Minn. 1994), for the proposition that it is prejudicial error for a district court to respond to a jury request for clarification by refusing to correct the confusion if the jury is obviously confused. *Shannon* is distinguishable, however, because it is not clear in the present case that the jurors were "obviously confused." Furthermore, in *Shannon*, the supreme court held that there was prejudicial error when the jury became confused after the "experienced prosecutor" made an "improper, misleading, and confusing argument" in his closing argument, and the district court failed to correct the resulting confusion. 514 N.W.2d at 793. There are no similar prosecutorial misstatements in this case. In fact, the prosecutor stated in his closing argument that, with regard to the second element, there are "actually kind of two elements within the one element," namely, "[w]as [A.S.] able to give consent to sexual activity and was [Gordon] on notice that she was unable to."

Because the jury was not obviously confused, the jury instructions correctly stated the law, and the prosecutor made no misleading statements, the district court did not abuse its discretion in directing the jury's attention to and rereading portions of the jury instructions.

**IV.**

In his pro se supplemental brief, Gordon argues that his conviction should be reversed because: (1) the state's witnesses testified falsely; (2) his counsel "could have performed better"; (3) his First Amendment rights of free speech and association were violated; and (4) his due process rights were violated.

14

All of Gordon's pro se arguments lack legal arguments and authority. *See State v. Bartylla*, 755 N.W.2d 8, 22 (Minn. 2008) ("[Appellate courts] will not consider pro se claims that are unsupported by either arguments or citations to legal authority."). But even if we review them, none of his claims have merit.

Gordon first argues that a number of the state's witnesses testified falsely at trial. The factfinder is the exclusive judge of witness credibility and the weight given to a witness' testimony. *State v. Mems*, 708 N.W.2d 526, 531 (Minn. 2006). Witness "credibility is not an issue for this court to consider on appeal." *State v. Garrett*, 479 N.W.2d 745, 747 (Minn. App. 1992), *review denied* (Minn. Mar. 19, 1992). The jury's verdict indicates that it found the witnesses' testimony to be credible, and this court defers to that determination.

Gordon next alludes to a claim of ineffective assistance of counsel by stating that his counsel "could have performed better," apparently referring to the fact that certain evidence was not presented at trial and that particular witnesses were not called. Generally, appellate courts will not review challenges to trial strategy. *Opsahl v. State*, 677 N.W.2d 414, 421 (Minn. 2004). "What evidence to present and which witnesses to call at trial are tactical decisions properly left to the discretion of trial counsel." *Mems*, 708 N.W.2d at 534. As Gordon's claim merely concerns his disagreement with the tactical decisions of his counsel, we conclude that Gordon has failed to establish that he received ineffective assistance of counsel.

Gordon did not raise the issue of the alleged violation of his constitutional rights at trial. This court generally does not consider issues that were not raised before the district

15

court.  *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996).  Therefore, Gordon's constitutional issues are waived.

Even if this court were to address the merits of Gordon's constitutional issues, his arguments would fail.  Gordon seems to argue that his First Amendment rights of speech and association were violated because he had a right to speak with and associate with A.S.  Gordon was not prosecuted, however, because of his speech or because he assembled with others.  Gordon was prosecuted because he violated a Minnesota statute prohibiting sexual penetration of an individual "the actor knows or has reason to know . . . is mentally impaired."  Minn. Stat. § 609.344, subd. 1(d).

In claiming that his due process rights were violated, Gordon contends that he, instead of the state, "had to prove that A.S. did have the capacity to consent."  However, the district court specifically instructed the jury that Gordon was presumed to be innocent and that the state had the burden to prove beyond a reasonable doubt that Gordon was guilty.

Gordon also argues that his due process rights were violated because the prosecutor failed to introduce certain evidence at trial, which was favorable to him.  The prosecution is required to disclose to the defense "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment."  *State v. Hunt*, 615 N.W.2d 294, 299 (Minn. 2000) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963)).  Gordon does not argue that the prosecution failed to disclose certain favorable evidence to the defense.  Instead, he only argues that the prosecution failed to introduce this evidence at trial.  Because Gordon has not cited any authority that the prosecution has

an obligation to introduce this allegedly more favorable defense evidence at trial, we conclude that Gordon has failed to show any violation of his due process rights.

**Affirmed.**