**In re GUARDIANSHIP OF Jeffrey DeYOUNG.**

No. A10–1768.

Court of Appeals of Minnesota.

July 11, 2011.

Laurel E. Learmonth, Primus Law Office, P.A., Minneapolis, MN, for appellant Mary DeYoung.

Daniel W. Boerigter, Steven L. Theesfeld, Yost & Baill, LLP, Minneapolis, MN, for respondent Ayanel Guardian Solutions.

Jennie M. Brown, Eden Prairie, MN, for ward Jeffrey DeYoung.

David DeYoung, Bloomington, MN, pro se respondent.

Considered and decided by HALBROOKS, Presiding Judge; HUDSON, Judge; and BJORKMAN, Judge.

## OPINION

HUDSON, Judge.

Appellant-mother challenges the denial of her petition to remove respondent-guardian and to be appointed successor guardian for the ward, appellant's adult son. Mother argues that the guardian improperly delegated her duties and powers to the ward's group home; that the guardian should have been removed as a result of the improper delegation; and that mother is the best qualified and most suitable person to serve as successor guardian. We remand for the district court to consider whether the guardian improperly delegated her powers and duties.

## FACTS

DeYoung is a 26–year–old ward of the state. He is autistic and non-verbal; he can occasionally use a communication board to answer yes or no questions. From birth until age 9, DeYoung resided with both his parents; but after their divorce, he lived with mother. At age 19, DeYoung transitioned into Chowen House, a group home operated by Pathways to Community (Pathways). DeYoung currently resides at Chowen House and attends a sheltered day program.

DeYoung has had three professional guardians since turning 19. Annette Kuhnley of Ayanel Guardian Solutions, DeYoung's current guardian, was appointed in September 2008. Kuhnley and her

business partner serve as guardians for approximately 50 wards, and Kuhnley is paid for two hours of work per month on DeYoung's case. Kuhnley visits DeYoung once a month, but the length of her visit depends on the amount of time she has spent performing other work on his case during the month.

In September 2009, mother petitioned for appointment of a successor guardian. DeYoung's attorney supported the petition, but father and Kuhnley opposed it. At the evidentiary hearing, mother, father, Kuhnley, the Chowen House director, and mother's sister and colleagues testified. The hearing focused on mother's claims that (1) Kuhnley should be removed because she permitted Pathways to restrict mother's visitation with DeYoung, allowed Pathways to exclude mother from DeYoung's medical appointments, and failed to ensure that Pathways was obtaining necessary medical care for him and (2) mother should be appointed successor guardian based on her training and experience in working with children with autism, her long history of caring for DeYoung, and her personal interest in ensuring his well-being.

### Visitation

Until the summer of 2008, mother had overnight visits with DeYoung on alternate weekends, and she generally did not visit him at Chowen House. But in July 2008, DeYoung's former guardian restricted mother to supervised visits at Chowen House because DeYoung had returned from an overnight visit exhibiting bruises on his body and engaging in aggressive behavior. Pathways made a vulnerable-adult report, but the department of adult protection did not contact mother and has closed the case.

At the end of October 2008, shortly after Kuhnley was appointed, Pathways barred mother from entering Chowen House because of her disruptive behavior during a supervised visit. DeYoung was watching a movie, and mother redirected him to participate in a telephone call with his aunt. DeYoung began to cry: mother testified that he was upset because he missed his visits with relatives, but the Chowen House director countered that DeYoung was agitated because he had been redirected from the activities in which he was engaged. The Chowen House director asked mother to leave.

Mother became upset and stated that, "this is violating [DeYoung's] civil rights" and "[DeYoung] has the right to talk, to hear his family's voice and to be with me [and] have my visit." Mother also said that, "[I]f you torture someone they're going to cry." At the evidentiary hearing, mother explained that she meant "emotionally torture my son by taking away his family." The Chowen House director testified that other residents gathered to see what was happening, and that she once again asked mother to leave, not only because mother had upset DeYoung, but because she had also disturbed other residents.

Kuhnley testified that it was Pathways' decision to restrict mother from Chowen House. Kuhnley further testified that she does not wish to restrict parental visits generally, but that she believed that Pathways' request to bar mother from Chowen House was reasonable. But Kuhnley did not explain the basis for her belief.

Kuhnley has gradually increased mother's visitation, but she has not permitted mother to visit DeYoung at Chowen House. In November 2008, Kuhnley allowed mother to begin taking DeYoung for visitation on Tuesday evenings. In January 2009, Kuhnley permitted mother to start taking DeYoung for additional visitation on Sundays during the day. And in April 2009, Kuhnley granted mother's re-

quest for overnight visits with DeYoung, although Kuhnley agreed to only one per month, whereas mother had requested two.

In the months prior to the hearing, mother was not able to visit DeYoung on Tuesday evenings because of her work schedule, nor was she able to take DeYoung for overnight visits because she had undergone surgery. Mother therefore requested permission for DeYoung to stay out later on Tuesday evenings so that she would have time to pick up DeYoung from Chowen House and take him out for visitation. But Kuhnley denied the request because it would interfere with the bedtime routine established by Pathways. Kuhnley testified that she did not know why it was necessary for DeYoung to go to bed at the time set by Pathways.

Mother agreed that she now has more visitation with DeYoung than she did before Kuhnley was appointed guardian. But she testified that she wanted additional visitation.

### Medical appointments

The order appointing Kuhnley as guardian includes the following provision regarding the access of DeYoung's parents to his medical records and appointments:

> DeYoung's parents ... are permitted unrestricted access to the ward's medical records and the ability to consult with all medical personnel that treat [DeYoung]. The successor guardian shall sign any necessary releases to facilitate this objective. However, neither parent shall be permitted to attend [DeYoung's] medical appointments without prior written consent of the successor guardian.

According to the Chowen House director, this provision was included because "[t]here [were] often times where [she] felt we could not address [DeYoung's] medical needs while [they were] in the appointment because [mother] would take control of the appointment, so [they] didn't have the opportunity to address things that [they] needed to address." Kuhnley testified that based on the order and the statements of the Chowen House director, she decided not to permit mother to attend DeYoung's medical appointments, including a recent oral surgery. Kuhnley admitted, however, that no medical professional had ever expressed concerns about mother's presence during those appointments.

Kuhnley testified that she was not opposed to updating mother on Jeffrey's medical conditions and appointments, and she further testified that she had signed releases to enable mother to obtain DeYoung's medical records. But she testified that neither she nor the group home notified mother about DeYoung's medical appointments. For example, Kuhnley testified that she did not inform mother or father of DeYoung's recent visit to urgent care for treatment for pneumonia. Kuhnley conceded that mother would have had to guess that a medical appointment had occurred to know to request the records of that appointment.

### Medical care

In September 2008, mother noticed that one of DeYoung's fingers was crooked and deformed, but a physician did not examine it until November 2008 when DeYoung had his annual physical. An x-ray was ordered but was not performed until July 2009, over six months later, and even then, the x-ray was performed on the wrong hand. Mother identified the error, and the correct finger was finally x-rayed in September 2009. Kuhnley admitted that neither she nor anyone at Chowen House noticed the error in the first x-ray until mother pointed it out. The record does not indicate that DeYoung suffered any serious or permanent injury to his finger.

Mother also testified that, during Kuhnley's tenure, mother became concerned that DeYoung, who is 6'4", had lost a significant amount of weight, going from 174 to 156 pounds. Mother testified that she called Kuhnley to express her concerns about DeYoung's weight loss, but Kuhnley did not respond. Mother testified that she therefore called the ombudsman, who interviewed a few people but did not take action because she thought DeYoung's weight was normal.

Kuhnley testified that she did not investigate DeYoung's weight loss because his physician said that DeYoung's weight was stable. It appears, however, that Kuhnley's understanding of DeYoung's weight was based solely on the reports of Chowen House, not on a conversation with DeYoung's physician or a review of DeYoung's medical records. Kuhnley testified that she had not asked DeYoung's physician why he was losing weight, but that Chowen House staff had raised that question and learned that DeYoung's physicians were unsure about the reason for his weight loss.

Mother also testified that, on January 15, 2009, DeYoung's day program sent a note to Pathways stating that DeYoung's lunches were small; that it was monitoring the size of his lunches; and that it would make a vulnerable-adult report if the size of the lunches did not increase. Mother testified that she called Kuhnley about the note, but the record does not indicate whether Kuhnley responded. There is no evidence of any additional complaints about the size of DeYoung's lunches or any reports to the department of adult protection. By the time of the hearing, DeYoung's weight had increased to 168 pounds.

Kuhnley also admitted that mother had notified her that, on August 18, 2009, one of DeYoung's physicians had ordered allergy tests that were not performed. Kuhnley testified that there was some confusion because the order was not included in Pathways' summary of the appointment, but she contacted the physician, who stated that he had ordered the test according to his notes. Kuhnley admitted that she only learned of the allergy test order and followed up with DeYoung's physician because mother contacted her.

Kuhnley also testified that, during the months prior to the hearing, DeYoung had been treated for a rectal tear, referred for a gastric examination, and taken to urgent care with pneumonia. Kuhnley testified that she did not contact DeYoung's physicians after learning that DeYoung had blood in his stool or that he was diagnosed with pneumonia. Kuhnley explained that she did not contact the physicians because, "[DeYoung] is adequately taken care of by staff. He is supervised 24 hours a day. Staff reports to me what they understand the doctor said."

Kuhnley testified that she relies on what qualified staff have to say about DeYoung and that she does not believe that she needs to be present at DeYoung's medical appointments. Kuhnley also testified that she only asks for reports regarding visits that indicate a change in DeYoung's health or medication and that she has not compared Chowen House's reports to DeYoung's medical records to ensure that the reports are correct. The Chowen House supervisor confirmed that she does not provide summaries of medical appointments unless Kuhnley requests them.

### Mother's capacity as a guardian

Mother testified that she would be the best guardian for DeYoung because she would be able to spend more time on his case than a professional guardian; she knows the history of his health better; and she understands how he communicates. Mother testified that she thought she could cooperate with father, and that if

father did not want to communicate with her directly, she could work with him through a third party. Mother also testified that she would keep DeYoung at Chowen House for the time being.

Several witnesses testified on mother's behalf. They included (1) a senior planning analyst at the department of aging and disability services, who had previously worked with mother to coordinate services for DeYoung; (2) a former employer, who had hired mother to care for his three autistic children; (3) DeYoung's former care attendant, who worked with DeYoung and mother; and (4) mother's sister, who has spent significant time with DeYoung and mother. All of the witnesses testified that mother is well-educated about autism, has extensive experience caring for DeYoung, and is capable of serving as his guardian.

Respondent-father testified that he is generally satisfied with Kuhnley's performance and the services provided by Pathways and that it is in DeYoung's best interests to have a professional guardian and to stay at Chowen House. Father testified that appointing mother as guardian would not be in DeYoung's best interests because "[she] has a very difficult time dealing effectively with people she disagrees with." Father is also concerned that if mother were appointed guardian, DeYoung would no longer be able to live at Chowen House, and DeYoung's life would be disrupted.

The Chowen House director confirmed that Pathways would no longer provide services to DeYoung if mother were appointed guardian. She testified that there are "not very many autism[-]based homes," but she could not state an exact number. The senior planning analyst from the department of aging and disability services countered that there were several possible housing options for DeYoung,

but he was unable to identify the number of homes or beds available for adults with autism.

### District court's order

The district court found that "[mother] has shown that life is not perfect at [Chowen House] and [Kuhnley] could at times have been a bit more responsive." But the district court concluded that mother had not established grounds for removing Kuhnley, nor had mother proved that she is the best qualified and most suitable person to serve as DeYoung's guardian. Mother appeals. DeYoung's attorney supports mother's appeal, although she has not filed a separate notice of appeal on behalf of DeYoung.

### ISSUE

Did the district court abuse its discretion by declining to remove DeYoung's guardian?

### ANALYSIS

The district court may remove a guardian if removal would be in the best interest of the ward or for other good cause. Minn.Stat. § 524.5–112(b) (2010). We review the decision to remove a guardian for an abuse of discretion and will not set aside the decision absent a clear abuse of that discretion. *In re Conservatorship of Geldert*, 621 N.W.2d 285, 287 (Minn. App.2001), *review denied* (Minn. Mar. 27, 2001). The district court abuses its discretion by improperly applying the law. *Whitaker v. 3M Co.*, 764 N.W.2d 631, 636 (Minn.App.2009), *review denied* (Minn. Jul. 22, 2009).

Mother contends that the district court abused its discretion by declining to remove Kuhnley in spite of evidence that Kuhnley unlawfully delegated her duties to Pathways and Chowen House. The district court did not explicitly address this

argument in its order likely because this argument was not as precisely articulated to the district court as it is on appeal. But in her closing argument to the district court, mother argued that "[the Chowen House director] has effectively become [DeYoung's] [g]uardian, since virtually all of the decisions she makes in regards to his care have become the law of this case." We believe that, by making this statement, mother adequately presented the improper-delegation argument to the district court. We therefore examine whether the district court abused its discretion in refusing to remove Kuhnley on that basis.

 The guardianship statute and caselaw does not squarely address a guardian's ability to delegate his or her powers and duties. But in interpreting the guardianship statute, we must read it as a whole and interpret each section in light of surrounding sections. *Eagan Econ. Dev. Auth. v. U–Haul Co. of Minn.*, 787 N.W.2d 523, 535 (Minn.2010). Mother contends that two provisions of the guardianship statute implicitly prohibit a guardian from delegating its powers and duties to a group home where the ward resides. We agree.

 Minn.Stat. § 524.5–313 discusses the powers and duties of a guardian. A court may appoint a guardian if any or all powers enumerated in the statute are necessary to provide for the ward's needs. Minn.Stat. § 524.5–313(c). But a guardian may be granted "only those powers necessary to provide for the demonstrated needs of the ward." Minn.Stat. § 524.5–313(b). And a guardian is "subject to the control and direction of the court at all times and in all things." Minn.Stat. § 524.5–313(a). Because Minn.Stat. § 524.5–313 concentrates in the district court the authority to appoint, direct, control, and specify powers of a guardian, we read it to prohibit a guardian from dele-

gating its powers and duties to a third party. Otherwise, the third party could execute the powers of a guardian without being appointed to that role by the district court and without being subject to the district court's supervision.

In addition, Minn.Stat. § 524.5–309 (2010) enumerates the classes of individuals and organizations that may and may not be appointed as a guardian. Among the entities that cannot be appointed guardian is "[a]ny individual or agency which provides residence, custodial care . . . or other care or service for which they receive a fee . . . unless related to the [ward] by blood, marriage, or adoption." Minn.Stat. § 524.5–309(c). This provision prohibits a ward's group home from serving as the ward's guardian and, in our view, underscores that a guardian may not delegate its powers and duties to a ward's group home. To interpret the provision otherwise would allow a ward's group home to perform the functions of a guardian, even though it is statutorily prohibited from assuming that role.

 In sum, because a guardian is vested with its duties and powers by the district court, the guardianship statute does not allow a guardian to delegate those duties and powers to a third party, especially one that is statutorily prohibited from serving as guardian. At the same time, "[a guardian's] statutory authority is not to be construed . . . as placing [the guardian] in a legal straitjacket which deprives [the guardian] of all discretion and flexibility in meeting the needs of the ward." *Grier v. Grier's Estate*, 252 Minn. 143, 148, 89 N.W.2d 398, 402–03 (1958). Thus, we do not read the guardianship statute to prohibit a guardian from relying on third parties to satisfy the ward's daily needs and to make routine decisions in meeting those needs. And while a guardian should not rubber-stamp recommenda-

tions by a group home or caregiver concerning the ward's needs and care, a guardian is not required to micromanage a group home or caregiver's efforts to satisfy the ward's needs and provide for the ward's care. *See* Minn.Stat. §§ 524.5–313(c) (requiring guardian to meet needs of ward), 309(c) (barring paid-service providers from guardianship); *Grier*, 252 Minn. at 148, 89 N.W.2d at 402–03 (recognizing need for discretion and flexibility). Rather, a guardian is responsible for making ultimate decisions about a ward's care, abode, and rights, and may consider, and even adopt, the recommendations of a group home or caregiver so long as the guardian has independently considered whether the recommendations are in the best interests of the ward. Such an approach ensures that a guardian does not eschew its responsibilities to the caregiver, while also allowing a guardian to rely on a caregiver or group home's expertise, knowledge, and advice under appropriate circumstances.

In its order, the district court summarized the testimony at the hearing, acknowledged certain lapses by Kuhnley and Chowen House, and concluded that they were insufficient to merit Kuhnley's removal. The district court did not, however, make findings as to whether Kuhnley improperly delegated her powers and duties to Pathways and Chowen House or whether she appropriately adopted their recommendations after due consideration. For example, the district court did not make findings as to whether Kuhnley rubber-stamped Pathways' initial and continued restrictions on mother's visitation or whether she reviewed Pathways' recommendations and determined in her own judgment that the restrictions were in DeYoung's best interests. The district court also did not make findings as to whether Kuhnley systemically withheld her consent for mother to attend DeY-oung's medical appointments or whether she independently determined that this prohibition was necessary. On this issue, we note that the district court does not appear to have considered Kuhnley's admission that none of DeYoung's physicians had expressed any concerns about mother's attendance at medical appointments. And finally, the district court did not make findings as to whether Kuhnley entrusted DeYoung's medical care to Chowen House or whether she took responsibility for ensuring that DeYoung received the medical care that he needed. Significantly, the district court does not appear to have addressed Kuhnley's admission that she primarily relies on Chowen House for reports regarding DeYoung's medical condition and care and that she did not contact DeYoung's physicians for any independent verification of Chowen House's reports until mother notified her that DeYoung had not received an x-ray and allergy tests that his physician had ordered. We therefore remand to the district court to make findings as to whether Kuhnley improperly delegated her powers and duties as guardian to Chowen House.

We acknowledge that there is a fine line between the permissible reliance on a group home for meeting the ward's day-to-day needs and the improper delegation to a group home of a guardian's powers and duties. For this reason, we entrust these findings to the sound discretion of the district court, which is in the best position to weigh the evidence and determine the credibility of the parties. Accordingly, we take no position on whether Kuhnley did, in fact, improperly delegate some or all of her powers and duties to Chowen House.

We also note that a petition for removal appears to be one of the primary mechanisms for notifying the district court of concerns with a guardian's performance and for addressing those concerns. *See*

Minn.Stat. § 524.5–112(b) (authorizing interested party to petition for removal of a guardian if it is in the best interests of the ward or for other good cause). But removal is a fairly extreme remedy for resolving concerns that might be best addressed through increased supervision of the guardian. *See* Minn.Stat. § 524.5–316(a) (2010) (stating that a guardian must submit a written report annually and whenever ordered by the district court). We therefore take this opportunity to point out that, although a petition to remove a guardian may be a proper mechanism for raising concerns about a guardian, the district court need not simply grant or deny the petition, but may fashion an intermediate remedy that serves the ward's best interests. *See* Minn.Stat. § 524.5–313(a) (stating that "[a] guardian shall be subject to the control and direction of the court at all times and in all things"). Should the district court decide to remove Kuhnley and reach the issue of whether mother is the best qualified and suitable person to serve as DeYoung's guardian, we note that the district court must make additional findings as to how its denial of mother's request to be guardian and its appointment of someone with lower or no priority is in DeYoung's best interests. *See* Minn.Stat. § 524.5–309(b) (2010) (stating that the district court "may decline to appoint a person having priority and appoint a person having a lower priority or no priority" if it would be in the best interests of the ward).

## DECISION

We remand to the district court to reevaluate the evidence and make findings as to whether Kuhnley improperly delegated her duties as a guardian to a care provider statutorily barred from assuming guardianship and if so, to fashion an appropriate remedy. The district court may, in its discretion, reopen the record to receive additional evidence.

**Remanded.**