*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0533**

In re the Guardianship of: Doris Anita Seward.

**Filed June 24, 2024
Affirmed
Gaïtas, Judge**

Hennepin County District Court
File No. 27-GC-PR-21-588

Taylor Lars Florin-Clemants, Minnetonka, Minnesota (self-represented appellant)

Patricia J. Stotzheim, Stotzheim Law Office & Mediation, LLC, St. Paul, Minnesota (for respondent Judith Yess)

Melanie Engh-Liska, St. Paul, Minnesota (for respondent Doris Seward)

Considered and decided by Connolly, Presiding Judge; Gaïtas, Judge; and Larson, Judge.

## NONPRECEDENTIAL OPINION

**GAÏTAS**, Judge

Doris Anita Seward has advanced Alzheimer's disease. Appellant Taylor Lars Florin-Clemants is Seward's adult grandson. Respondent Judith Yess is Seward's daughter and legal guardian. In July 2022, Yess moved Seward from her home—where she had been under the care of Florin-Clemants—to an assisted-living facility. Florin-Clemants then filed a petition to remove Yess as Seward's guardian, appoint himself as a successor guardian, and return Seward to her home. The district court denied the petition, and Florin-Clemants now appeals that decision. He argues that the district court erred as a matter of

law by denying his request to remove Yess as guardian and abused its discretion by denying his request to change Seward's abode. Because the district court did not err in denying Florin-Clemants's petition, we affirm.

## FACTS[1]

Seward, who is currently 91 years old, experienced mental decline and memory issues beginning in 2013, and she was diagnosed with Alzheimer's disease in 2016. In 2014, Seward wrote a letter to her children expressing her desire to "stay in [her] house as long as" possible. While the letter acknowledged that Seward eventually "may have to move," she requested that her children "allow [her] to make decisions, with [their] help[,] as long as [they could]."

It became apparent to Seward's family in the fall of 2018 that Seward's condition had progressed to the point where she could no longer care for herself. Yess and Florin-Clemants agreed that Florin-Clemants would live in Seward's home rent free and act as a permanent caregiver while Yess would handle Seward's finances and provide supplemental care for Seward. When Florin-Clemants moved in, he had Seward sign a "caregiver agreement." The agreement identified Florin-Clemants's expectations for Seward, such as being "calm, relaxed, happy," and "us[ing] good judgement when walking around the house to prevent falls or other injury." It stated that "[i]f [Seward] [was] not able to follow these agreements then [Florin-Clemants] will not be very happy and it

---

[1] Our statement of facts summarizes the evidence that the parties presented during the contested evidentiary hearing held in connection with Florin-Clemants's petition.

2

[would] make him think twice about wanting to care for [her] and keep [her] in [her] house."

In 2019, Seward executed an updated health care directive (HCD) and a power of attorney form (POA). Seward appointed Yess as her attorney-in-fact and named Yess and Florin-Clemants as co-healthcare agents, with Yess having the final say if the two disagreed on the proper course of treatment. The HCD gave Yess and Florin-Clemants the power to "choose where [Seward] live[s] when [she] need[s] health care." Around the same time, Florin-Clemants applied for services through the Hennepin County alternative care waiver program on Seward's behalf. The waiver program granted Seward funds for personal-care-assistant (PCA) hours. Because Florin-Clemants was acting as Seward's PCA, he paid himself using these funds.

In October 2021, Seward fell and broke her hip. She was placed in a transitional-care unit for occupational therapy and physical rehabilitation. Yess told Florin-Clemants that, given the advanced level of care Seward now required, she would not be going back to her house after she was discharged from the transitional-care unit. When Florin-Clemants disagreed with this decision, Yess stopped communicating with him about Seward's care. Florin-Clemants then filed a petition for emergency guardianship of Seward. The district court granted the emergency petition[2] and—against medical advice—Florin-Clemants removed Seward from the transitional-care unit to her home. Following these events, Florin-Clemants began limiting the amount of time Yess and other family

---

[2] The emergency-guardianship order terminated in February 2022.

members could spend with Seward because he believed that he and Seward "deserve[d] an apology" for how they had been treated while Seward was in the transitional-care unit.

Consequently, Yess filed a petition asking the court to appoint her as Seward's permanent guardian. In the petition she alleged that Seward "need[ed] assistance with dressing, toileting, meal preparation, and personal hygiene . . . [and] require[d] assistance when ambulating, [and] need[ed] 24/7 supervised, awake care for safety and basic needs." The petition stated that Seward's needs could not be met at home and that she required "24/7 awake care of which, is just far too great a burden for one person to handle, even with some assistance coming into the home." Florin-Clemants objected and filed a competing petition asking the court to appoint him as Seward's guardian and conservator.

As a part of the guardianship appointment process, Yess and Florin-Clemants agreed to allow a neutral guardian ad litem to "conduct an assessment and provide a professional opinion as to the best interests of [Seward] based on her observations of [Seward's] current living situation and interviews with her family and caregivers." The guardian ad litem reported she was concerned (1) that "if [Seward] had a medical issue," Florin-Clemants would not recognize it in time to get her help; (2) about Seward's "hydration and nutrition"; (3) "about the potential for isolation from family members due to the current family dynamics and dysfunction"; and (4) about finances because Florin-Clemants was not keeping any receipts showing how he was spending Seward's money.

In June 2022, the parties eventually reached a private agreement (stipulation) that appointed Yess as Seward's "sole limited Guardian." The stipulation stated, in relevant part, that:

2. Taylor Florin-Clemants and another Personal Care Attendant (PCA) shall provide 24-hour care of Doris Anita Seward, including awake overnight care.

3. . . . If a significant event occurs, Taylor Florin-Clemants shall notify Judith Yess as soon as reasonably possible. Judith Yess will in turn notify Taylor Florin-Clemants in the event of new information or as updates become[] available to her.

. . . .

5. Judith Yess shall remove her personal items from the home of Doris Anita Seward within a reasonable time. The Parties shall also encourage other family members who have personal belongings stored in the home of Doris Anita Seward to remove their belongings. Taylor Florin-Clemants shall make reasonable efforts to clean and declutter the home of Doris Anita Seward.

. . . .

7. Judith Yess shall review the concerns raised by [the guardian ad litem] in her report . . . .

Yess and Florin-Clemants agreed that the "Stipulation [was] subject to change and modification depending upon the level of care required by [Seward]" and that Yess, "as court-appointed Guardian, [would] be the party with the authority to make such change or modification."

The district court subsequently entered an order finding that Seward was a vulnerable adult who "require[d] 24/7 awake care." It found that Seward's "short-term and long-term memory is greatly impaired," that she was only oriented to herself, "has impaired mobility and impaired activities of daily living," "needs assistance with hygiene and dressing," and requires a diet of "moist and minced food and thin liquids." Based on the parties' stipulation, the court appointed Yess as Seward's sole-limited guardian with the

5

powers and duties listed in Minnesota statutes section 524.5-313(c)(l), (2), (3), (4), (6), (7), and (10) (2022), which included the power to "establish [Seward's] place of abode" and to "[p]rovide for [Seward's] care, comfort, and maintenance needs."

To abide by the requirement that Seward receive full-time awake care, Florin-Clemants's friend, J.K., moved into Seward's home. J.K. had already been helping care for Seward a few hours a week, an arrangement that Florin-Clemants established in March 2022.

In early July 2022, Yess informed Florin-Clemants that she was coming to pick up Seward for a family birthday party. When Yess arrived at Seward's home, Florin-Clemants physically tried to stop Yess from taking Seward, expressing concern for Seward's safety and health. Yess had to call the police to resolve the situation. Florin-Clemants later learned that Yess took Seward to an assisted-living facility for a care evaluation rather than to a birthday party. On July 19, 2022, Yess moved Seward's residence to the assisted-living facility.

On July 21, 2022, Florin-Clemants filed an emergency petition requesting the district court to remove Yess as Seward's guardian, appoint Florin-Clemants as successor guardian, and stay the change of Seward's abode.[3] The petition alleged that Yess violated Seward's rights as a person subject to guardianship by moving her to a care facility against her wishes. *See* Minn. Stat. § 524.5-120(2) (2022) (stating that guardian should give "due consideration of [the person subject to guardianship's] current and previously stated

---

[3] Florin-Clemants filed a petition for a stay of change of abode, but the district court construed it as a petition for a change of abode because Seward had already moved from her home before the petition was filed.

6

personal desires and preferences, including but not limited to medical treatment preferences . . . and other preferences and opinions"). Additionally, the petition asserted that Yess violated the June 2022 stipulation by not informing Florin-Clemants about the move to the assisted-living facility and by not addressing the concerns raised in the guardian ad litem's report.[4] Yess objected to Florin-Clemants's petition.

In the fall of 2022, the district court presided over a four-day evidentiary hearing on Florin-Clemants's petition.[5] Florin-Clemants testified that Seward's 2014 letter demonstrated her desire "to stay at her house as long as she possibly can" and that Seward told him "every day" how important her home was to her. But Florin-Clemants acknowledged that Seward's HCD and POA gave Yess the authority to make the final decision about Seward's abode.

Florin-Clemants testified that he did not feel comfortable "being around [Yess] or her immediate family or the people that [he] felt [were] conspiring with her to take Grandma away from her house and have [him] evicted." He testified that Yess breached the June 2022 stipulation by not removing her belongings from Seward's home and by moving Seward to the assisted-living facility without notice. Florin-Clemants also told the

---

[4] During a hearing, the district court heard arguments on Florin-Clemants's emergency petition. Following the arguments of counsel, the district court concluded that the circumstances did not present an emergency. The district court stated that it would schedule a contested evidentiary hearing in the matter.

[5] The district court waived Seward's appearance at the evidentiary hearing because she "had no indication or understanding of the nature of these proceedings," "was not able to answer any questions coherently," and could not "communicate her needs" or her preference on where she lived. Seward's interests were represented at the hearing by a court-appointed lawyer.

district court that he was dissatisfied with the care at the assisted-living facility. He noted that Seward's health had seemed to decline and that the five-to-one staff-to-patient ratio was inadequate. In Florin-Clemants's view, Seward would receive better care in her own home with two or three PCAs.

Florin-Clemants's parents, who live in Colorado, testified on behalf of Florin-Clemants. His father is Seward's son. Both parents expressed their belief that Florin-Clemants is well equipped to care for Seward until her death.

Finally, Florin-Clemants's friend J.K. testified about her care for Seward. Beginning in March 2022, she served as a PCA for Seward once or twice per week. In June 2022, she moved into Seward's home to help provide round-the-clock care. She explained that Florin-Clemants looked after Seward in the morning and early afternoon while she provided care from around 3:00 p.m. to 3:00 a.m. Although this care schedule was "manageable," she agreed that adding a third PCA would have been helpful.

J.K. admitted that she had no formal training in caring for people with dementia, but she testified that she had previously cared for her father, who also had Alzheimer's. She explained that she was paid for her work with Seward through the alternative care waiver program. Although she worked more hours than she was allowed to bill through that program, "room and board" in Seward's home "was payment enough" for the extra work.

Following the presentation of Florin-Clemants's evidence, Yess moved for judgment as a matter of law (JMOL) on Florin-Clemants's requests to remove Yess as guardian and appoint Florin-Clemants as a successor guardian. The district court granted the motion, determining that Florin-Clemants had "not provided sufficient evidence to

8

support that it's in [Seward's] best interest to remove [Yess]."[6] Thus, the only remaining issue before the district court was whether Seward should remain at the assisted-living facility. Yess presented evidence as to this issue.

Family member, S.A., who is related to Seward through marriage, testified that, before she retired, she was a physical therapist working with "people 65 and older" and people at the "end-of-life." S.A. testified that she visited Seward at the assisted-living facility once a week, which she had been unable to do when Seward was living at home because Florin-Clemants had restricted family visits. She explained that Seward "does not seem aware of where she is . . . [and has not] pin[ed] away to be any place other than where she [is] right at the moment." In S.A.'s opinion, Seward's physical health, sleeping and bathroom habits, and weight had "improved" since she moved to the assisted-living facility. S.A. told the district court that she was concerned about Seward returning home because round-the-clock care is expensive and Seward's home, a cluttered split-level house, "is not very conducive for caring for somebody, especially somebody who spends a lot of time in a wheelchair."

During her testimony, Yess explained that the assisted-living facility was the safest, healthiest, and most financially responsible place for Seward to reside. She testified that, while it was not financially possible to fund round-the-clock awake care in Seward's home, by selling the home, the family could afford to keep Seward at the assisted-living facility for the long term. Yess told the district court that, at the assisted-living facility, Seward

---

[6] The court also found that, even if Yess was removed as Seward's guardian, it would "decline to appoint Taylor Florin-Clemants as its successor guardian based on it not being in [Seward's] best interests."

9

had access to physical and occupational therapists, nurses, nutritionists, craft events, and church services. Although Yess had "asked [Seward] multiple times, like if [she] want[s] to go home," Seward had "no concept" of what home meant.

Seward's granddaughter testified that she frequently visited Seward at the assisted-living facility and that Seward "seem[ed] to be doing well." In her opinion, two people would be unable to care for Seward in her current state and the family could not afford to hire a third caregiver.

Finally, Seward's niece—a trained "dementia care specialist"—testified that she was concerned about the care Florin-Clemants had been providing. She explained that to provide adequate round-the-clock awake care at home "you would need a minimum of at least four people, and you would need to have a really good backup plan in the event that one or more of them would be unable at any point in time to work their shift."

After the hearing, the district court filed an order denying Florin-Clemants's petition in its entirety.

Florin-Clemants appeals.

**DECISION**

I. **The district court did not err by granting Yess's motion for JMOL and denying Florin-Clemants's petition to remove Yess as Seward's legal guardian.**

Florin-Clemants first argues that the district court erred when it denied his petition to remove Yess as Seward's guardian and appoint him as a successor guardian. The Uniform Guardianship and Protective Proceedings Act, Minn. Stat. §§ 524.5-101 to -502 (2022), governs the appointment and removal of a guardian for an incapacitated person, including a vulnerable adult. Under this act, "[a] person subject to guardianship, person

10

subject to conservatorship, or interested person may petition for removal of a guardian or conservator on the ground that removal would be in the best interest of the person subject to guardianship or conservatorship or for other good cause." Minn. Stat. § 524.5-112(b). The petitioner bears the burden of proving removal is in the best interest of the person subject to guardianship by clear and convincing evidence. *See* Minn. Stat. § 524.5-317. A removal petition "may include a request for appointment of a successor guardian or conservator." Minn. Stat. § 524.5-112(b).

Generally, appellate courts "review the decision to remove a guardian for an abuse of discretion." *In re Guardianship of DeYoung*, 801 N.W.2d 211, 216 (Minn. App. 2011). But here, the district court granted Yess's motion for JMOL and denied Florin-Clemants's petition as a matter of law. Under Minnesota Rule of Civil Procedure 50.01(a), "[a] court may grant judgment as a matter of law if 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis'" to find in favor of the party on that issue. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 220 (Minn. 2014) (quoting Minn. R. Civ. P. 50.01(a)); *see* Minn. Stat. § 524.1-304 (2022) (stating that, unless doing so would be inconsistent with a relevant probate statute, probate proceedings should comply with the rules of civil procedure). Appellate courts review the district court's decision to grant or deny JMOL de novo, viewing the evidence in the light most favorable to the nonmoving party. *Kidwell v. Sybaritic, Inc.*, 784 N.W.2d 220, 229 (Minn. 2010).

In granting Yess's motion for JMOL, the district court concluded that Florin-Clemants's argument that Yess violated Seward's rights as a person subject to guardianship by moving her to an assisted-living facility failed as a matter of law "because a healthcare

11

directive nominates [Yess] and specifically allows [her] to make decisions on where [Seward] lives." Additionally, the district court observed that Florin-Clemants presented no evidence that Yess had acted in bad faith when "deciding whether or not [Seward] should have been moved to the nursing home" and that Yess did not violate the June 2022 stipulation because Yess's actions were in Seward's best interests.

Florin-Clemants argues the district court's ruling was error for three reasons. First, he asserts that the district court's finding that the HCD was valid is clearly erroneous because Seward did not have the mental capacity to understand the HCD when she signed it in 2019. Second, he contends that the record shows that Yess violated Seward's rights as a person subject to guardianship by contravening her wish to remain at home. And third, he argues that the district court erred in determining that Yess did not violate the June 2022 stipulation and that there was no evidence that Yess failed to act in Seward's best interests.

## A.    The HCD is valid.

We first address Florin-Clemants's argument that the district court clearly erred in finding that the HCD was valid due to Seward's cognitive impairment. A person is competent to enter a contract if they have "the ability to understand to a reasonable extent the nature and effect of what she is doing." *In re Guardianship of Dawson*, 502 N.W.2d 65, 68 (Minn. App. 1993) (quotation omitted), *rev. denied* (Minn. Aug. 16, 1993). "Mental weakness alone is not sufficient to demonstrate that a contracting party is mentally incompetent if that party reasonably understands the nature and effect of entering into the contract." *Nelson v. Holland*, 776 N.W.2d 446, 451 (Minn. App. 2009). The party alleging

12

incapacity to contract bears the burden of proof. *Trimbo v. Trimbo*, 50 N.W. 350, 351 (Minn. 1891).

"Whether a party is competent to execute a contract is a question of fact." *Nelson*, 776 N.W.2d at 450. A district court's factual findings are reviewed for clear error. *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (quotations and citations omitted). A factual finding is clearly erroneous if it is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted). When reviewing findings of fact for clear error, appellate courts (a) "view the evidence in a light favorable to the findings," (b) do not find their own facts, (c) do not reweigh the evidence, and (d) do not "reconcile conflicting evidence." *Id.* at 221-22 (quotations omitted). "When the record reasonably supports the findings at issue on appeal, it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary." *Id.* at 223 (quotation omitted).

Here, the district court reasoned that "[a] lot of testimony was given regarding what [Seward] wanted, but the HCD specifically states that the [healthcare agent] has authority to make personal security measures that are needed to keep her safe." The district court found that the HCD itself was valid. And the district court further "found no reason to doubt [Seward's] wishes as stated in the HCD."

Florin-Clemants argues that the district court clearly erred in finding that the HCD expressed Seward's wishes because her capacity in 2019 was severely diminished due to the progression of her Alzheimer's. He points out that the district court expressly

13

recognized Seward's cognitive limitations by noting concern about Seward's ability to comprehend the "caregiver agreement" she signed at Florin-Clemants's insistence in 2018.

However, viewing the evidence in the light most favorable to the findings, we discern no clear error in the district court's finding that the HCD was valid. The record evidence supports this finding, and, as the appellate court, we do not reweigh the evidence. *See Kenney*, 963 N.W.2d at 223. Moreover, we disagree with Florin-Clemants's assertion that the district court's finding regarding Seward's capacity to understand the 2018 "caregiver agreement" contradicts the finding regarding the validity of the 2019 HCD. The HCD was a notarized document identifying the person responsible for Seward's healthcare decisions. By contrast, the "caregiver agreement" was an informal document listing Florin-Clemants's expectations for Seward, which the district court found to be unrealistic given Seward's limitations. We also note that Florin-Clemants never contested the validity of the HCD during the proceedings before the district court. In fact, he stipulated to the admission of the HCD into evidence. Thus, we reject Florin-Clemants's challenge to the district court's finding that the HCD was valid.

**B.     Yess did not violate Seward's rights as a person subject to guardianship.**

Florin-Clemants next contends that Yess violated Seward's rights as a person subject to guardianship by moving Seward to the assisted-living facility. Minnesota law sets forth a "bill of rights" for persons subject to guardianship. *See* Minn. Stat. § 524.5-120. Under this bill of rights, a guardian must give "due consideration [to the person subject to guardianship's] current and previously stated personal desires and preferences, including but not limited to medical treatment preferences . . . and other preferences and

opinions." Minn. Stat. § 524.5-120(2). Florin-Clemants argues that Yess's actions violated this specific provision. In support of this argument, he points to Seward's 2014 letter to her children, which expressed her desire to remain in her home.

However, viewing the evidence in the light most favorable to Florin-Clemants, we conclude that the district court did not err in determining that there was an insufficient evidentiary basis for it to find that Yess violated Seward's right to consideration of her preferences. Other than Florin-Clemants's testimony regarding his personal beliefs about Seward's wishes, Florin-Clemants presented no evidence that Seward wished to live in her home at the time of the hearing. The three witnesses who testified on behalf of Florin-Clemants acknowledged that they had never spoken with Seward about her end-of-life care. And even Seward's 2014 letter acknowledged that her time at home "may end." By executing the HCD, Seward gave Yess authority to decide where she would reside for healthcare. Given the evidence, the district court did not err in determining as a matter of law that Yess did not violate Seward's right to have her preferences considered.

### C. Because Yess was acting in Seward's best interests, her violation of the June 2022 stipulation is not grounds for removal as guardian.

Finally, Florin-Clemants argues that the evidence showed that Yess violated the June 2022 stipulation by failing to remove her personal belongings from Seward's house and by not giving him advanced notice of Seward's move to assisted living. And given this evidence, he contends that the district court erred in denying his petition to remove Yess as Seward's guardian.

The district court observed that the stipulation stated that "it was subject to change and modification depending upon the level of care required." Moreover, the stipulation

15

specified that Yess would have authority to make changes or modifications. Based on these provisions in the stipulation, and because there was no evidence that Yess had failed to act in Seward's best interests, the district court rejected Florin-Clemants's argument that any violation of the stipulation was grounds to remove Yess as Seward's guardian.

Viewing the evidence in the light most favorable to Florin-Clemants, we discern no error in the district court's reasoning. Florin-Clemants failed to present evidence showing that Yess's decision to move Seward to the assisted-living facility was not in Seward's best interests.

Based on our de novo review, we conclude that the district court did not err in denying Florin-Clemants's petition to remove Yess as Seward's guardian. Florin-Clemants failed to present evidence showing that removal of Yess as guardian would be in Seward's best interests. *See* Minn. Stat. § 524.5-317.[7]

## II. The district court did not abuse its discretion by denying Florin-Clemants's petition to change Seward's abode.

Florin-Clemants argues that the district court abused its discretion by denying his petition to change Seward's abode from the assisted-living facility to her home. "[T]he power to have custody of the person subject to guardianship and the power to establish a place of abode within or outside the state" generally rests with the guardian. Minn. Stat. § 524.5-313(c)(1). But "[t]he person subject to guardianship or any interested person may petition the court to prevent or to initiate a change in abode." *Id.* A district court

---

[7] Given that we are affirming the denial of the removal petition, we do not address the district court's decision or Florin-Clemants's arguments regarding the petition to appoint a successor guardian.

16

determines whether "to prevent or to initiate a change in abode" by examining what action would be in the best interests of the person subject to guardianship. *See id.*; *see also DeYoung*, 801 N.W.2d at 216.

The denial of a petition to change a ward's abode is reviewed for an abuse of discretion. *See DeYoung*, 801 N.W.2d at 216. A district court abuses its discretion if its findings of fact are unsupported by the record or if it improperly applies the law or if it resolves the question in a manner that is contrary to logic and the facts on record. *Woolsey v. Woolsey*, 975 N.W.2d 502, 506 (Minn. 2022).

The district court denied Florin-Clemants's change of abode petition because it found that Seward's "care, comfort, and maintenance needs" were being met by the assisted-living facility, *see* Minn. Stat. § 524.5-313(c)(2), and that it was not financially feasible to meet those needs with at-home care. Furthermore, the district court determined that Yess had acted within her rights as guardian and under the HCD to choose Seward's abode.

Florin-Clemants challenges the district court's finding that it was more financially responsible for Seward to reside in the assisted-care facility than at home. But this finding has ample support in the record. During Yess's testimony, she explained that one week of round-the-clock awake care required 168 caregiver hours; because the alternative waiver program only covered 65 PCA hours per week, Seward would have to recover the remaining 103 PCA hours; on average private PCA care is $30 per hour; the additional 103 hours of care per week at that rate would cost $12,360 per month; and Seward's monthly income is $2,600. On the other hand, Yess testified, the assisted-living facility costs

$11,000 per month, and she expects that monthly cost will decrease after a few years. Yess testified that she anticipated selling Seward's home for approximately $300,000, which would cover continued care at the assisted-living facility. The district court found Yess's testimony to be credible, and we give "due regard to the district court's determinations regarding witness credibility." *In re Guardianship of Wells*, 733 N.W.2d 506, 510 (Minn. App. 2007) (quotation omitted), *rev. denied* (Minn. Sept. 18, 2007).

Florin-Clemants also contends that residing at the assisted-living facility is harming Seward. He asserts in his brief that Seward is confined to her room, socially isolated from her friends and family, and is not adequately supervised due to the five-to-one staff-to-patient ratio. But the record does not support the claims in Florin-Clemants's brief. S.A., Yess, and Seward's granddaughter all testified that Seward was doing well in the assisted-living facility. They also testified that they visited Seward frequently. And these witnesses testified that when Seward was in her home, Florin-Clemants limited their visits with Seward. Moreover, the record shows that Seward is receiving additional services, such as physical and occupational therapy, at the assisted-living facility that she did not receive at home. Although Florin-Clemants testified that Seward's legs were swollen due to her inactivity at the assisted-living facility, S.A. directly refuted this contention, and the district court found S.A.'s testimony to be credible given her professional background working with people over 65 years old. *See id.*

As noted, Yess had authority as Seward's guardian, her healthcare agent under the HCD, and under the stipulation to select Seward's abode. The district court did not abuse

its discretion in determining that Yess properly exercised that authority and that residing in the assisted-living facility is in Seward's best interests.[8]

**Affirmed.**

---

[8] For the first time on appeal, Florin-Clemants raises various statutory arguments. He first argues that Yess violated the Minnesota vulnerable adults act (MVAA), Minn. Stat. §§ 626.557-.5573 (2022), the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (2022), and a federal statute criminalizing a "conspiracy against rights," 18 U.S.C. § 241 (2022). Additionally, he asserts that several Minnesota statutes are "vague" and therefore unconstitutional. Specifically, he challenges Minnesota Statutes sections 626.5572 (the MVAA definitions), 523.23 (2022) (the statutory form for general power of attorney), 524.5-313 (describing the powers and duties of guardians), and 609.2335 (2022) (criminalizing the financial exploitation of vulnerable adults). We do not address these statutory arguments because Florin-Clemants did not raise them to the district court. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that a party cannot raise a new issue on appeal, "[n]or may a party obtain review by raising the same general issue litigated below but under a different theory"); *In re C.L.L.,* 310 N.W.2d 555, 557 (Minn. 1981) (refusing to consider important constitutional challenges to an involuntary termination of parental rights because the arguments were not raised in the district court); *In re Welfare of D.D.G.*, 558 N.W.2d 481, 485 (Minn. 1997) (citing this aspect of *C.L.L.*); *Butler v. Jakes*, 977 N.W.2d 867, 873 (Minn. App. 2022) (same).